UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Wanda Boston**

   **v.**                                           Civil No. 10-cv-00250-PB
                                                      Opinion No. 2011 DNH 099
**Michael J. Astrue, Commissioner**,
**Social Security Administration**


MEMORANDUM AND ORDER


    Wanda Boston challenges the Social Security Commissioner's denial of her application for disability insurance benefits. Boston contends that the administrative law judge incorrectly found that she was not disabled.  For the reasons set forth below, I affirm the Commissioner's decision.


I.  **BACKGROUND**

A.  **Administrative Proceedings**

    On June 23, 2008, Wanda Boston filed an application for Disability Insurance Benefits ("DIB"), alleging disability as of November 15, 2007.  (Tr. 96-103).  After her application was denied, Boston requested an administrative hearing.  (Tr. 47). On January 11, 2010 an Administrative Law Judge ("ALJ") held a

hearing at which Boston, who was represented by counsel, appeared and testified.  (Tr. 4-26).  On January 27, 2010, the ALJ issued his decision finding that Boston was not disabled.  (Tr. 27-41).  After the Decision Review Board failed to complete its review within the allotted time, the ALJ's decision became final and ripe for judicial review.

**B.   Introduction**

Boston was 49 years old when the ALJ issued his decision. (Tr. 7).  Boston alleged disability due to pain and problems involving her "back and right side" that affected her ability to stand for long periods of time.  (Tr. 121-22, 146).  In the disability report filed with her appeal Boston also noted, for the first time, that she was receiving counseling.  (Tr. 146-47).

**C.   Physical Impairments**

Notes from Dr. Hoke Shirley indicate that Boston suffers from rheumatoid arthritis[1].  (Tr. 182, 240-41).  On December 7,

---

[1] "Rheumatoid Arthritis" is a "chronic systemic disease primarily of the joints . . . usually marked by inflammatory changes in the synovial membranes and articular structures and by muscle atrophy and rarefaction of the bones."  Dorland's Illustrated Medical Dictionary 152, 159 (31st ed. 2007).

2006, Dr. Shirley noted that, upon examination, Boston had a full range of motion in the joints of her extremities. (Tr. 182). However, Boston's then current medications were not working. (Tr. 182-83). Dr. Shirley "[n]oted osteoarthritic change superimposed in the right knee" and he reported that Boston needed "additional therapy to methotrexate[2] to control her rheumatoid disease." (Tr. 182). Accordingly, Dr. Shirley recommended alternative medication and other treatment. (Tr. 183).

On January 11, 2007, Dr. Shirley noted that Boston was tolerating her new medication well and that her rheumatoid disease was better controlled. (Tr. 180). She had a full range of motion in most extremity joints. (Tr. 180).

On March 8, 2007, Dr. Shirley reported that Boston had done extremely well, without any "flare-ups" in her extremities. (Tr. 178). Boston reported a "little increased articular pain" in her hands and feet occasionally. (Tr. 178). She had a full range of motion in all extremity joints. (Tr. 178).

---

[2] "Methotrexate" refers to "a folic acid antagonist that acts by inhibiting synthesis of DNA, RNA, thymidylate, and protein" and is used in the treatment of rheumatoid arthritis. Id. at 1169.

On May 17, 2007, Dr. Shirley noted that Boston was "not doing as well," having reported pain in her hands, wrists, and feet.  (Tr. 175).  Examination showed some limitation of motion in her left wrist, but a good range of motion in other extremities.  (Tr. 175).  Dr. Shirley opined "one cannot deny the irrefutable erosive disease and joint space narrowing that are noted in the hand and foot films.  I do think she has mildly active disease."  (Tr. 222).

On July 16, 2007, Dr. Shirley stated that Boston was "doing pretty well."  (Tr. 173).  Boston had her gallbladder removed, and Dr. Shirley opined that Boston's "flare-up" had been due to the gallbladder disease.  (Tr. 173).  On September 12, 2007, Dr. Shirley noted that Boston had gone off her medication, but was "not flaring-up too badly."  (Tr. 171).  She had a full range of motion in all extremity joints except the right knee.  (Tr. 171).  Dr. Shirley stated that Boston's rheumatoid disease remained under good control.  (Tr. 171).

On October 31, 2007, Dr. Shirley noted that Boston was doing relatively well.  (Tr. 218).  She had "a little

[4]

dislocation of her right knee" and some pain on patellofemoral[3] pressure testing with some crepitus[4], but otherwise had a full range of motion.  Weakness was noted in her right quadriceps muscle and there also trace effusion[5] of the right knee.  (Tr. 218).  On December 7, 2007, Boston was given a knee brace.  (Tr. 217).

On January 7, 2008, Dr. Shirley noted that Boston was experiencing "severe pain with abduction[6], both with passive maneuvers and on forced maneuvers of that left shoulder where she has pain on forced external rotation and a little pain on forced internal rotation. . . . Apprehension[7] test is severely painful."  (Tr. 169).  Dr. Shirley's assessment of Boston indicated that she had "substantial rotator cuff issues in the

---

3 "Patellofemoral" is defined as "pertaining to the patella [bone situated at the front of the knee] and the femur [bone that extends from the pelvis to the knee]." Id. at 696, 1415.

4 "Crepitus" is a "grating sensation caused by the rubbing together of the dry synovial surfaces of joints." Id. at 437.

5 "Effusion" is the "escape of fluid into a part or tissue." Id. at 603.

6 "Abduction" is the "draw[ing] away from the median plane or (in the digits) from the axial line of a limb." Id. at 2.

7 "Apprehension" is "anticipatory fear or anxiety." Id. at 122.

right shoulder." (Tr. 169).  Boston otherwise had a full range
of motion in all extremity joints.  (Tr. 169).

On March 10, 2008, Dr. Shirley noted that Boston was
reporting increased pain down her right leg that had persisted
for three or four weeks.  (Tr. 167).  Upon examination, she was
missing the right knee reflex.  (Tr. 167).  She had a full range
of motion in all extremity joints and no pain with straight leg
raising.  Strength testing was 5/5.  (Tr. 167).  Dr. Shirley
stated that Boston was doing reasonably well with her rheumatoid
disease, but her "right knee, as usual, has a lot of crepitus
and a 1+ effusion" and her disease was still bothering her.
(Tr. 167).

On April 15, 2008, Dr. Shirley stated that, chronically,
Boston's rheumatoid arthritis was not active.  (Tr. 166).
Boston complained, however, of mechanical back pain, as well as
osteoarthritis pain in her right knee.  (Tr. 165).  Dr. Shirley
noted that Boston had some soft-tissue pain in her back, but was
otherwise doing well.  (Tr. 166).  Upon examination, Boston did
have some tender points in her neck, shoulder, back, and hip,
but had a good range of motion in most extremity joints and
negative straight leg raising.  (Tr. 165).  Dr. Shirley noted

[6]

that Boston had used more narcotic medication than he would have
expected given her back pain.  (Tr. 165).  He proceeded to
perform bilateral trigger point injections of Depo-Medrol[8] and
lidocaine[9].  (Tr. 166).

Medical notes dated April 28, 2008, indicate that Boston
complained of increasing back pain.  (Tr. 188).  She reported
her pain as an 8 on a 0-10 scale.  (Tr. 188).  Boston received a
minor diagnosis of back pain, which appeared to be soft-tissue
in origin.  (Tr. 190).  Robaxin[10] was prescribed.  (Tr. 191).

On June 4, 2008, Boston visited the emergency room after
falling down some stairs.  (Tr. 303).  She was complaining about
pain in her right hip, leg, and knee.  (Tr. 303).  She was
diagnosed with right-sided pain after a fall.  (Tr. 304).  A

---

[8] "Depo-Medrol" is the "trademark for preparations of
methylprednisolone acetate."  Id. at 499.  "Methylprednisolone
acetate" is "used in replacement therapy for adrenocortical
insufficiency and as anti-inflammatory and immunosuppressant in
a wide variety of disorders."  Id. at 1171.

[9] "Lidocaine" is "a drug having anesthetic, sedative, analgesic,
anticonvulsant, and cardiac depressant activities, used as a
local anesthetic, applied topically to the skin and mucous
membranes."  Id. at 1048.

[10] "Robaxin" is a "trademark for preparations of methocarbamol."
Id. at 1675.  "Methocarbamol" is "a skeletal muscle relaxant."
Id. at 1165.

radiology report on Boston's right knee showed mild osteoarthritis.  (Tr. 307).  Three days later, Boston visited the emergency room again, complaining of continued right leg pain.  (Tr. 301).  She was diagnosed with right leg pain secondary to a contusion.  (Tr. 302).

On June 11, 2008, Dr. Shirley noted that Boston had a degenerative knee.  (Tr. 212).  Boston had also slipped on some steps and had hurt her knee and hip.  (Tr. 212).  Boston was doing reasonably well with her rheumatoid disease.  (Tr. 212).  Boston had "a little quadriceps weakness in her right knee" as well as effusion, but otherwise had a full range of motion.  (Tr. 212).  Straight leg raising was negative.  (Tr. 212).

On July 2, 2008, in her function report, Boston indicated that her daily activities consisted of showering, taking her medications, watching television, doing laundry, sweeping and washing floors, taking out the trash, reading, taking care of her dogs, cats, and fish, visiting with her grandchildren, and taking care of her husband.  (Tr. 128-30).  She had no problems bathing, caring for her hair, shaving, or using the toilet.  (Tr. 129).  She stated she occasionally had problems buttoning and zipping her clothes, cutting food, and opening things.  (Tr.

129).  She did not need reminders to take care of herself, to take her medications, or to go places.  (Tr. 130, 132).  She was able to prepare simple, one-course meals.  (Tr. 130).  She could drive, and would go shopping for food, household items, and medication.  (Tr. 131).  She was able to manage her finances. (Tr. 131).  She socialized with friends once or twice a month, enjoyed reading and watching television.  (Tr. 131).  She estimated that she could lift 10-15 pounds, but stated that she could not squat or kneel, that climbing stairs was difficult, and that she could not stand for long or walk long distances. (Tr. 133).  She also stated she was losing her eyesight and wore glasses.  (Tr. 134).  She had no problem paying attention or following instructions.  (Tr. 133).  She had no problem getting along with others, handled stress well most of the time, and could handle changes in her routine.  (Tr. 134).

Boston visited the emergency room on July 23, 2008, complaining of back pain radiating into her right leg.  (Tr. 296).  She was diagnosed with lumbar pain.  (Tr. 297).  On August 1, 2008, Boston again visited the emergency room complaining of back pain radiating into her right leg.  (Tr.

294).  She was diagnosed with lumbar radiculopathy[11].  (Tr. 295).

On August 12, 2008, Dr. Dominic Geffken wrote a letter outlining Boston's medical problems and stating that they had affected her ability to work.  (Tr. 234).  A radiology report from August of 2008 showed mild degenerative changes in Boston's lumbar spine.  (Tr. 293).

On September 19, 2008, Dr. Shirley noted that Boston had undergone an MRI of her back.  (Tr. 238).  It showed minimal degenerative disc disease and degenerative joint disease of her lumbar spine, but no evidence of central or foraminal stenosis[12] or substantial discogenic[13] injury.  (Tr. 238).  In addition to back pain, Boston reported "increasing pain in the wrists, the knuckles, bilaterally in the knees, and certainly in the forefeet, bilaterally."  (Tr. 238).  These symptoms were said to be "consistent with some findings on her examination."  (Tr. 238).  A few days later, Boston injured her right wrist while

_____

[11] "Radiculopathy" is a "disease of the nerve roots."  Id. at 1595.

[12] "Stenosis" is "an abnormal narrowing of a duct or canal."  Id. at 1795.

[13] "Discogenic" is "caused by the derangement of an intervertebral disc."  Id. at 534.

doing laundry and was diagnosed with a contusion.  (Tr. 280-81).

On January 7, 2009, Boston reported substantial hip pain. (Tr. 236).  She was doing pretty well with her peripheral arthritis and rheumatoid disease.  (Tr. 236).  Her right knee was still a problem, but she had a full range of motion in all joints.  (Tr. 236).  Dr. Shirley stated, however, that Boston was quite limited in her functional capacity and opined that she did not think she could work full-time in any capacity.  (Tr. 236).  She was described as having "dysfunctional lumbar pain" and "substantial post-inflammatory osteoarthritis of the right knee."  (Tr. 236).

Boston fell and injured her right hand in January of 2009. No acute process was detected, and she was diagnosed with a wrist sprain.  (Tr. 266, 268).  She fell and injured her right shoulder in February of 2009 and was diagnosed with a contusion. (Tr. 248-249).

On March 9, 2009, Dr. Shirley stated that Boston was doing fairly well from an inflammatory disease standpoint with her rheumatoid disease.  (Tr. 235).  However, it was noted "[h]er back pain is another problem that is certainly and currently not well-controlled."  (Tr. 235).  Boston reported some right hip

[11]

pain that had increased after a slip and fall.  (Tr. 235).  Dr.
Shirley noted that Boston had substantial lumbar dysfunctional
pain without discogenic abnormalities noted on an MRI.  (Tr.
235).  She had a good range of motion in most extremity joints.
(Tr. 235).  "Further infusions" were recommended.  (Tr. 235).

From May 13, 2009 through November 24, 2009, Boston made
several visits to Concord Hospital for exacerbation of chronic
back pain, migraine headache, chest pain, vomiting, injuries
from falls, right knee problems, hip pain, and right radicular
leg pain.  (Tr. 381-417).

D.   **Mental Impairments**

On August 25, 2008, Boston reported that she had started
counseling with Maryann Simoni, M.A.  (Tr. 146-47).  On
September 9, 2008, she noted she was seeing Ms. Simoni for
"mental health sessions" and that she had also had an
appointment with a psychiatrist, William Dinon, Ph.D., on
September 12, 2008, for a psychiatric evaluation.  (Tr. 153).
Records from Concord Hospital Family Health Center indicate
Boston was seen for counseling with David R. Twyon, MSW, LICSW
on July 9, 2008.  (Tr. 554-56).  She thereafter started sessions
with Ms. Simoni on August 5, 2008 and continued to see her on

[12]

August 18, 2008, August 25, 2008, September 16, 2008, and
October 9, 2008.  (Tr. 521-24, 529-30, 534-35, 542-47).  Ms.
Simoni opined that Boston suffered from "309.0 Adjustment
Disorder with Depressed Mood" and rule/out "300.4 Dysthymic
Disorder."  (Tr. 544).

   She was assigned a Global Assessment of Functioning (GAF)
score of 62.[14]  (Tr. 544).

**E.   <u>Physician Assessments</u>**

     On July 15, 2008, Dr. Charles Meader completed a physical
residual functional capacity (RFC) assessment on behalf of the
Agency.  (Tr. 226-33).  Dr. Meader concluded that Boston could
lift and carry up to ten pounds occasionally and frequently.
(Tr. 227).  He found she could stand and/or walk for at least
two hours in an eight-hour workday and that she could sit for up
to six hours in an eight-hour workday.  (Tr. 227).  According to
Dr. Meader, she had an unlimited ability to push and pull; could
occasionally climb, balance, stoop, kneel, crouch, and crawl;
and was advised to avoid concentrated exposure to temperature

_____

[14] A GAF of 61-70 indicates some mild symptoms (e.g., depressed
mood and mild insomnia) or some difficulty in social stressors
and no more than a slight impairment in social, occupational, or
school functioning.  <u>Diagnostic and Statistical Manual of Mental
Disorders</u> 34 (4th Ed. 2000).

extremes and hazards (machinery, heights, etc.).  (Tr. 228-30).
Dr. Meader indicated that "[m]ost weight is given to Dr Hoke
Shirley, MD, rheumatologist, the treating source."  (Tr. 233).

On July 2, 2009, Dr. Shirley completed a questionnaire in
which he opined Boston had significant functional limitations.
(Tr. 375-80).  Dr. Shirley stated that Boston's pain would
"often" interfere with her attention and concentration, that she
has "good days" and "bad days" and would be absent from work
more than four times per month.  (Tr. 379).  Dr. Shirley opined
that Boston could walk for one-half of a block without rest or
severe pain; sit for 30 minutes continuously; stand for 15
minutes continuously; stand/walk for about two hours in an
eight-hour workday; sit for about four hours in an eight-hour
workday; and needed employment that would allow her to shift
positions at will from sitting, take unscheduled breaks during
an eight-hour workday every two hours and rest for 15-20 minutes
before returning to work.  (Tr. 377-78).  Dr. Shirley further
opined that with prolonged sitting, Boston's legs needed to be
elevated waist high and if working a sedentary job, her legs
should be elevated 30% of an eight-hour workday.  (Tr. 378).
Dr. Shirley stated that Boston could occasionally lift less than

[14]

10 pounds, and her hands, fingers, and arms could grasp, turn, and twist, finely manipulate, and reach, respectively, for 20% of an eight-hour working day.  (Tr. 378-79).  He concluded that Boston could never stoop or crouch and had difficulties with extreme temperatures.  (Tr. 379).

**F.**   **Hearing Testimony**

    Boston testified that she was unable to work due to arthritis in her knees and feet, as well as bad wrists and fingers.  (Tr. 9).  She also testified to having lupus and fibromyalgia and added that she had occasional migraines.  (Tr. 9).

    On a typical day, she watched television and read occasionally.  (Tr. 10).  Once per week, she would clean the house and do laundry.  (Tr. 10).  She was able to lift a 12-pack of soda, which she estimated to be about 10 pounds.  (Tr. 10). She estimated that she could walk one-half a block and that she could stand for 10-15 minutes.  (Tr. 17).  She was able to drive when necessary.  (Tr. 10).  She testified that she suffered from pain constantly and that her medications did not completely relieve her pain, but did numb it.  (Tr. 11, 18).  She stated that her pain interfered with her ability to concentrate.  (Tr.

[15]

11-12, 16).  She experienced pain in her lower back, right leg,
feet, knees, hips, hands, and wrists.  (Tr. 12-16).  She said
that she spent most the day with her feet up and that she slept
in a reclining chair.  (Tr. 13-15).  She testified that she
could not use a computer due to the pain in her hands and
wrists.  She had difficulty buttoning shirts.  (Tr. 15).

A vocational expert ("VE") also testified at the hearing.
(Tr. 19-25).  The ALJ asked the VE whether an individual who
could lift only ten pounds but who could walk or stand for up to
four hours per eight-hour workday and sit for up to six hours
per eight-hour workday, push and pull without limitation, and
who needed to avoid concentrated exposure to temperature
extremes and hazards, could perform Boston's past relevant work
or other work that existed in significant numbers in the
national economy.  (Tr. 21).

The VE testified that Boston could perform her previous job
as a sewing machine operator.  (Tr. 21).  The VE further
testified that there were other jobs existing in significant
numbers in the national economy which Boston could perform.
(Tr. 22).  Specifically, he testified that she could perform the
following jobs: telemarketer, DOT 299.357-014 (1,000 regionally

and 350,000 nationally); optical lens assembler, DOT 713.687-018
(50 regionally and 5,000 nationally); eye glass frame polisher,
DOT 713.684-038 (50 regionally and 5,000 nationally);
receptionist DOT 237.367-038 (500 regionally and 70,000
nationally); appointment clerk DOT 237.367-010 (500 regionally
and 70,000 nationally); information clerk, DOT 237.367-022 (500
regionally and 70,000 nationally) data clerk, DOT 209.387-022
(200 regionally and 40,000 nationally); credit card clerk
209.587014 (200 regionally and 40,000 nationally).  (Tr. 22-23).

**G.   The ALJ's Decision**

The ALJ followed the five-step sequential evaluation
process established by the Social Security Administration, as
set forth at 20 C.F.R. § 404.1520, to determine whether Boston
was disabled.  (Tr. 30-37).  Under the first step, the ALJ found
that Boston had not engaged in substantial gainful activity
since her alleged onset date.  (Tr. 32).  Under steps two and
three, the ALJ found that Boston had the severe impairments of
rheumatoid arthritis and lumbar degenerative disc disease but
that Boston had no impairment(s) that met or equaled an
impairment listed under Appendix 1, Subpart P of Social Security
Regulations No. 4.  (Tr. 32-33).

[17]

The ALJ went on to find that Boston retained the residual functional capacity (RFC) to perform sedentary work involving lifting up to ten pounds, walking or standing up to four hours per eight-hour workday, sitting for up to six hours per eight-hour workday, unlimited pushing and pulling, occasional bending, stooping, kneeling, crouching, climbing, or crawling, and no concentrated exposure to temperature extremes or hazards. (Tr. 33).  The ALJ next found that Boston could perform her past relevant work as a sewing machine operator.  (Tr. 35). Alternatively, he found that Boston could make an adjustment to other work in the national economy, noting VE testimony regarding the jobs of telemarketer, optical goods assembler, eyeglass frame polisher, clerical receptionist, appointment clerk, information clerk, data clerk, and credit card clerk. (Tr. 36).  Accordingly, the ALJ found that Boston was not disabled at any time through the date of his decision.  (Tr. 37).

## II.   STANDARD OF REVIEW

An individual seeking Social Security benefits has a right to judicial review of a decision denying his application.

[18]

See 42 U.S.C. § 405(g).  I am empowered to affirm, modify,
reverse or remand the decision of the Commissioner based upon
the pleadings submitted by the parties and the transcript of the
administrative record.  See id.  However, my review is limited
to determining whether the ALJ used the proper legal standards
and found facts based on the proper quantum of evidence.  See
Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

     The factual findings of the Commissioner are conclusive if
they are supported by "substantial evidence."  See id.
Substantial evidence is evidence which a "reasonable mind,
reviewing the evidence in the record as a whole, could accept
. . . as adequate to support [the] conclusion."  Rodriguez v.
Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir.
1981).  If the substantial evidence standard is met, the ALJ's
factual findings are conclusive even if the record could support
a different conclusion.  See Irlanda Ortiz v. Sec'y of Health &
Human Servs., 955 F.2d 765, 770 (1st Cir. 1991).

     In addition, it is "the responsibility of the [ALJ] to
determine issues of credibility and to draw inferences from the
record evidence."  Id. at 769.  It is the role of the ALJ, and
not the role of this court, to resolve conflicts in the

[19]

evidence.  <u>Id.</u>

### III.  <u>ANALYSIS</u>

Boston challenges the ALJ's decision for several reasons.
First, Boston faults the ALJ for failing to make findings with
respect to Boston's mental status using the special technique
for mental impairments outlined in 20 C.F.R. Section 404.1520a.[15]
Next, Boston contends that the ALJ erred by failing to give Dr.
Shirley's opinion controlling weight.  Finally, Boston claims
that the ALJ impermissibly determined that she had the RFC to
perform her past relevant work and/or other sedentary work.  I

---

[15] In addition Boston contends that the ALJ erred by failing to
obtain the opinion of a psychiatrist or psychologist when
presented with evidence of a potential mental impairment as
required by 42 U.S.C. § 421(h).  While best practices counsel
that the ALJ should have consulted with a psychiatrist or
psychologist before rending his opinion, 42 U.S.C. § 421(h) did
not require him to do so in the instant case.  Section 421(h)
states that "an initial determination under subsection (a), (c),
(g), or (i)" shall be made only if the Commissioner endeavors to
obtain a qualified opinion.  42 U.S.C. § 421(h).  By its terms,
the precatory language of Section 421(h) does not apply to
Section 421(d), which deals with ALJ hearings.  As a result,
because the first evidence of Boston's counseling only arose
before her ALJ hearing (i.e. following her "initial
determination" for benefits), the Commissioner did not run afoul
of the requirements of Section 421(h).  See Plummer v. Apfel,
186 F.3d 422, 433 (3rd Cir. 1999).

will address each argument in turn.

## A.   <u>Mental Impairment Findings</u>

In her initial application for benefits, Boston noted that she was not limited in her ability to work by emotional or mental problems.  (Tr. 124).  Later, in her "Disability Report-Appeal" form, Boston indicated that she had begun counseling since her initial benefits denial.  (Tr. 146).  Between August and December 2008, Boston saw Maryann Simoni, M.A., LCMHC for six (6) counseling sessions.  (Tr. 521-24, 529-30, 534-35, 542-47).  During this period, Boston also saw Dr. William Dinon for a psychiatric evaluation.  (Tr. 153).  A little less than two weeks before the ALJ's hearing, Ms. Simoni opined that Boston suffered from "Adjustment Disorder with Depressed Mood."  (Tr. 544).  Following these evaluations, Boston was assigned a GAF score of 62, indicating mild symptoms with no more than a slight impairment in social, occupational, or school functioning.  (Tr. 544).

Boston claims that the ALJ erred in failing to make findings regarding her adjustment disorder using the special technique for mental impairments listed in 20 C.F.R. Section 404.1520a.  The Commissioner contends that the ALJ was not

[21]

required to make such findings, and argues in the alternative that any error by the ALJ was harmless.

While it would have been prudent for the ALJ to address Boston's counseling, Boston has not adequately alleged that she suffers from a disabling mental impairment. See 20 C.F.R. 404.1520a(b)(1). The claimant bears the burden of providing medical evidence showing that he or she suffers from a medically determinable impairment that prevents him or her from working. See 20 C.F.R. §§ 404.1512, 404.1520(a)(4)(ii); Gray v. Heckler, 760 F.2d 369, 372 (1st Cir. 1985). In her application for DIB, Boston gave no indication that she suffered from any mental ailments. (Tr. 124). Moreover, when testifying in front of the ALJ, neither Boston nor her lawyer considered it worthwhile to offer or elicit any testimony about potential mental impairments and how these impairments prevented her from working. See 20 C.F.R. §§ 404.1512, 404.1520(a)(4)(ii); Gray, 760 F.2d at 372. While Boston now highlights the opinion of Ms. Simoni, Ms. Simoni is not an "acceptable medical source." See 20 C.F.R. §§ 404.1508, 404.1513(a)(2). Because Boston failed to carry her burden of establishing a medically determinable mental impairment, the ALJ is excused from addressing these potential

[22]

impairments in his opinion.  See 20 C.F.R. §§ 404.1512,

404.1520(a)(4)(ii); Rodriquez v. Sec'y of Health & Human Servs.,

46 F.3d 1114, *4 n. 14 (1st Cir. 1995); Gray, 760 F.2d at 372;

O'Dell v. Astrue, 736 F.Supp.2d 378, 390 (D.N.H. 2010).

**B.    Treating Source Opinion**

Boston also claims that the ALJ committed reversible error

by failing to accord controlling weight to the opinion of Dr.

Shirley.  Dr. Shirley, who had treated Boston for over ten

years, filled out an RFC questionnaire in which he opined that

Boston suffered from significant functional limitations which,

if credited, would support a finding of disability. (Tr. 23-24,

375-80).  Underlying his opinion, Dr. Shirley noted, were

clinical and objective signs of: pain, crepitus, and decreased

range of motion in the right knee, severe tenderness/pain in her

lumbosacral spine, positive flip test and positive strait leg

raising.  (Tr. 375).  While the ALJ recognized Dr. Shirley's

opinion, he afforded it less weight than that of state physician

Dr. Meader because of its inconsistency with the record.  (Tr.

35).

A treating source's opinion will be given controlling

weight if it is well supported by medically acceptable clinical

[23]

diagnostic techniques and is not inconsistent with other
substantial evidence in a claimant's case record.  See SSR 96-
2p, 1996 WL 374188, at *2 (July 2, 1996).  When a treating
physician's opinion is not given controlling weight, its weight
is dependent on the factors provided in 20 C.F.R. §§ 404.1527
and 416.927.  Id. at *4.  These include: the evidence provided
to support the opinion, the degree to which the opinion is
consistent with the record, the extent of the treating source's
knowledge of the impairment and other factors that are raised by
the claimant.  See 20 C.F.R. § 404.1527(d)(1)-(6).

    Dr. Shirley's opinion is inconsistent with substantial
evidence in the record and therefore the ALJ was justified in
according his opinion less weight.  See 20 C.F.R. §
404.1527(d)(2)-(4); Irlanda Ortiz, 955 F.2d at 769-70.  First,
Dr. Shirley's opinion is inconsistent with his objective
findings.  See 20 C.F.R. § 404.1527(d)(2)-(4).  While Dr.
Shirley indicated that his RFC was based on clinical findings of
decreased range of motion in the right knee, severe
tenderness/pain in her lumbosacral spine, positive flip test and
strait leg raising, his treatment notes consistently state that
Boston had a full range of motion of all joints, that flip and

[24]

strait leg tests failed to elicit back or leg pain, and that she had full motor strength.  (Tr. 165, 167, 169, 171, 178, 180, 182, 212-15, 218-19, 221, 223-25).  Moreover, Dr. Shirley's opinion that Boston suffers from severe tenderness/pain in her lumbosacral spine is not entirely consistent with Boston's professed ability to perform certain activities of daily living including: sweeping and washing the floors, emptying the trash, doing the laundry and taking care of her husband.  See 20 C.F.R. § 404.1529(c)(3); (Tr. 130).  Finally, Dr. Shirley's opinion is inconsistent with the opinion of Dr. Meader.  After reviewing Boston's medical records and other evidence, Dr. Meader opined that Boston retained the ability to perform the physical requirements of a sedentary job.  See (Tr. 227).  While Dr. Meader is a non-treating physician, his opinion is detailed and well supported with objective medical evidence contained in the record.[16]  See 20 C.F.R. § 404.1527(d)(ii)(3); Berrios Lopez v.

---

[16] Dr. Meader, who formulated his RFC before Dr. Shirley completed his own, noted that he relied primarily on the findings of Dr. Shirley.  The fact that Dr. Meader determined Boston retained the RFC to perform sedentary work based on Dr. Shirley's objective findings is itself evidence of the inconsistency between Dr. Shirley's treatment notes and her own RFC.

Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir.
1991); (Tr. 233).

While other aspects of the record support Dr. Shirley's
opinion, the fact remains that his opinion is also inconsistent
with substantial evidence in the record.  As a result, it was
within the ALJ's discretion to afford his opinion less weight.
I cannot upset this decision.  See Lizotte v. Sec'y of Health &
Human Servs., 654 F.2d 127, 128 (1st Cir. 1981)("the resolution
of conflicts in the evidence and the determination of the
ultimate question of disability is for [the ALJ] not for the
doctors or for the courts").

## C.  **RFC to Perform Sedentary Work**[17]

Finally, Boston contends that the ALJ's determination that
she retained the residual functional capacity to perform the
full range of sedentary work was not substantially supported.
Specifically, Boston contends that the ALJ failed to
comprehensively describe her limitations in the series of
hypotheticals he posed to the VE because he neglected to

_____

[17] Because the ALJ's determination that Boston retained the
ability to perform sedentary work is supported by substantial
evidence, I need not pass on the ALJ's additional determination
that she could perform her past relevant work.

incorporate her mental limitations and the RFC of Dr. Shirley.[18]

At step five of the sequential evaluation process the burden shifts to the ALJ to show that there are jobs in the national economy that the claimant can perform given her RFC. Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991). One way for the ALJ to carry his burden is through the testimony of a VE.

> But in order for a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities. To guarantee that correspondence, the Administrative Law Judge must both clarify the outputs (deciding what testimony will be credited and resolving ambiguities), and accurately transmit the clarified output to the expert in the form of assumptions.

Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982).

In this case, the hypotheticals the ALJ posed to the VE

---

[18] Boston also faults the ALJ for his reliance on the opinion of Dr. Meader who she contends "did not have the benefit of reviewing over 300 pages of medical records added to the record since he reviewed the case." Pl.'s Mot. for Order Reversing Decision of the Commissioner at 8. However, Boston makes no attempt to address how the additional un-reviewed medical records would upset Dr. Meader's opinion. See Senay v. Astrue, C.A. No. 06-548S, 2009 WL 229953, *4 (Jan. 30, 2009).

accurately corresponded with limitations drawn from the ALJ's RFC, which itself was supported by substantial evidence.  <u>See id.</u>  As previously explained, Boston did not carry her burden of proving that she suffered from a mental limitation.[19]  Therefore, the ALJ did not err when he omitted Boston's purported mental limitations from his hypotheticals.  Similarly, because the ALJ was justified in excluding Dr. Shirley's opinion from the RFC, Dr. Shirley's limitations also needn't be reflected in the ALJ's line of questioning.  <u>See Gallagher v. Astrue, No. 08-CV-163-PB, 2009 WL 929923, *8-*9 (Apr. 3, 2009)</u>.  As a result, the ALJ, through the testimony of the VE, carried his burden of proving that Boston can perform jobs that exist in significant numbers in the national economy.

## IV.   <u>CONCLUSION</u>

The ALJ's decision is supported by substantial evidence in the record.  Therefore, I am without the authority to overturn it.  Plaintiff's motion for order affirming the decision of the

---

[19] While the ALJ bears the burden of proving the existence of jobs given the claimant's RFC, the claimant bears the burden of proving the limitations that factor into the RFC. 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2).

[28]

Commissioner (Doc. No. 10) is granted, and the plaintiffs'

motion for order reversing the decision of the Commissioner

(Doc. No. 9) is denied.   Accordingly, the clerk shall enter

judgment and close the case.

      SO ORDERED.

                                       /s/Paul Barbadoro
                                       Paul Barbadoro
                                       United States District Judge

June 22, 2011

cc:  Raymond J. Kelly, Esq.
      Gretchen Leah Witt, Esq.